**Affirmed and Memorandum Opinion filed December 19, 2019.**



In The

# Fourteenth Court of Appeals

### NO. 14-19-00560-CV

## IN THE INTEREST OF A.A.C., A.E.C, E.S.C. AKA E.C., JR., CHILDREN

**On Appeal from the 312th District Court
Harris County, Texas
Trial Court Cause No. 2017-25634**

## M E M O R A N D U M   O P I N I O N

Appellant E.C. ("Father") appeals the trial court's final decree terminating parental rights to his children A.A.C. ("Ada"), A.E.C. ("Ally"), and E.S.C. ("Eddy")[1] and appointing the Texas Department of Family and Protective Services (the "Department") as the children's sole managing conservator. The trial court terminated Father's parental rights on predicate grounds of endangerment, failure to complete a family service plan, abuse of a controlled substance, and criminal

---

[1] We use fictitious names to identify the minor and other individuals involved in this case. *See* Tex. R. App. P. 9.8.

conduct that resulted in conviction and imprisonment for not less than two years and an inability to care for the children. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), (P) and (Q). The trial court further found that termination of Father's rights was in the children's best interest. *See* Tex. Fam. Code § 161.001(2). Father challenges the legal and factual sufficiency of the evidence to support the trial court's findings on all predicate grounds and that termination is in the children's best interest. Because we conclude the evidence is legally and factually sufficient to support the trial court's judgment, we affirm.

## Background

In April 2017, J.V. ("Velma"), the children's aunt, filed a petition in suit affecting the parent-child relationship on the grounds "the child/ren's present circumstances will significantly impair (*harm*) the child/ren's physical health or emotional development." In the petition, Velma asked for general relief but did not request any specific form of relief regarding custody, possession, or access.

The Department became involved when it received a referral of neglectful supervision on September 21, 2017, because K.A. ("Mother") abandoned the children, ages 5, 3 and 1, at Memorial Herman Northwest Hospital. Mother had sought treatment for nausea and alleged vomiting. After telling hospital staff that she was going to the lobby to retrieve something, Mother left the premises and never returned. After waiting at the hospital for two hours, the children were taken to a Department office. Mother was a resident of Santa Maria Hostel and seeking treatment for a methamphetamine addiction. Because Mother left the children at the hospital unsupervised, failed to arrange for their care, was being treated for drug addiction, and had not contacted the Department or sought to be reunited with the

2

children, the Department was given temporary conservatorship of the children. At the time of this incident, Father was incarcerated.

The Department prepared family service plans for both Father and Mother, which both signed in October 2017. In September 2018, however, the Department filed a petition for conservatorship and termination of parental rights. The court conducted a bench trial in March and June of 2019. The trial court's final order terminated Father's and Mother's parental rights to all three children.

## Trial Evidence

The witnesses at trial were Amanda Quintero, the Department's caseworker from September 2017 until December 2018; Mario Munoz, the caseworker at the time of trial; Father, who appeared by telephone from jail; and Seth Charna, the foster father.

The Department introduced evidence of Father's criminal history. Father was incarcerated from October to December 2016. He pled guilty to family violence assault, received deferred adjudication, and was placed under community supervision for three years. Mother was the complainant in that case and the assault occurred in the presence of or near the children. That was Father's second assault charge—in 2004, he was convicted of committing assault against a person with whom he was in a dating relationship.

The State filed a motion to adjudicate guilt in July 2017. Among other allegations, the State asserted Father committed trespass and used cocaine, as evidenced by two drug tests in May and June of 2017. As a result, Father was again incarcerated from August to October 2017. The court granted the motion to adjudicate, signed a judgment adjudicating guilt in May 2018, and sentenced Father to two years' confinement in the Texas Department of Criminal Justice, Institutional

Division.  Father was in jail as a result of this adjudication from May 2018 through trial in this case.

Meanwhile, in September 2017, the State charged Mother with felony possession of a controlled substance and she was released to Houston Recovery Center.  The children, who were periodically in the care of Velma and "numerous" other relatives, returned to Mother's care.  Less than one week later, Mother abandoned the children at the hospital.  The children stayed at Kidz Harbor before placement with a paternal cousin, "Louise," but Louise never intended to be a permanent caregiver.  The children were then placed with "Sally," a different paternal cousin.  The family caregivers asked for the children to be removed.  The Department was unable to find any other family members to care for the children.  Velma was given an opportunity to have the children placed with her, on the condition that her husband pass a drug test, but the test never occurred.  The Department did not place the children with Velma because of her husband's criminal history of possession of a controlled substance, and Velma removed herself as a potential relative to care for the children.  Father's mother and sister were also considered.  However, the paternal grandmother was on probation and the paternal aunt had an adult son who has a criminal history residing in her home.  Mother did not offer any additional person with whom the children could be placed.  When Quintero left the case in December 2018, the Department could not locate any family to accept placement of the children.

In October 2017, Quintero met Mother at the jail on the same day she visited Father at the jail.  Quintero reviewed with Mother and Father their respective family plans of service.  Both signed their plan.  When Quintero asked Father why he was incarcerated, Father said he was not certain but that he "woke up" arrested and was told it was because he committed aggravated assault.

4

Quintero had several phone and text conversations with Mother. Mother said she would meet with Quintero but never did. Mother did not perform any of the tasks on her family service plan and did not visit with the children during the time Quintero was the case worker. Mother told Quintero that she would complete the plan but could not provide Quintero with an address or phone number where she could be reached after her release. Quintero provided Mother with Quintero's contact information, but Mother never contacted Quintero before he left the Department. At the time of trial, Quintero did not know Mother's whereabouts. Mother never alleviated the concerns that brought the children into care.

Quintero testified that before Mother abandoned the children, Velma was the person caring for them, not Mother or Father. Since 2017, neither Mother or Father had cared for the children. Quintero stated that Mother left the children "in an endangering circumstance" and "endangering environment." Mother had no home of which Quintero was aware, and Quintero had no idea of Mother's whereabouts.

In April 2018, Mother's bond was revoked because she failed to report to the program required on her bond. In October 2018, Mother pled guilty to possession of cocaine and was sentenced to nine months in the Harris County Jail. When Quintero left the case in December 2018, Mother was incarcerated in Louisiana.

From October 2017, Quintero was in communication with Father for two or three months, by phone and in person. Quintero reviewed Father's family service plan with him, at least four times. After Father signed the plan, he began working on it. Over the phone, Quintero and Father reviewed the services that Father had completed, including a psychosocial assessment and a drug evaluation. The recommendation from the psychosocial assessment was for individual therapy, which was already a requirement of the family service plan. Although Father began individual therapy, Quintero did not believe he completed it.

5

The recommendation resulting from Father's drug evaluation was random urine analysis ("UA") and hair follicle testing, parenting classes, a domestic violence class, and a twelve-step program. At the time of trial, Father had not completed any of these services. Quintero did not receive a certificate for completion of a parenting class. Father did not ever participate in any drug testing. Father had begun a Battering Intervention and Prevention Program ("BIPP") but Quintero did not receive a certificate for completion of BIPP.

After Father was released from custody in October 2017, he reported to Quintero that he was working but provided no proof of income. Father told Quintero where he was living, with his mother's ex-husband, but provided no proof. As mentioned, Father was arrested again for assault against another family member in February 2018. In May 2018, Father pled true to the motion to adjudicate guilt. At trial in that case, Father admitted to taking drugs while on community supervision and admitted to a history of substance abuse. Father was sentenced to prison for two years, which he began serving immediately. Father testified his anticipated date of release was October 2019. By that time, the children would have been in the Department's care for a full two years since the Department filed its petition in intervention. Quintero did not know where Father would be able to go upon his release, or of any home he could provide for the children.

While incarcerated, Father did not seek out services to assist him in completing his family plan of service. Father did not complete any services dealing with substance abuse. Father did not remember if any services were available in prison dealing with domestic violence or assaultive behavior. Father testified that after he returned to jail in February 2018, he did not know he could complete his service plan while in prison and was not in contact with the Department. Father stated that he received a letter, but did not recall what it said. Father had not had any

6

contact with Mother in over two years. From September 2017 until December 2018, Father had one supervised visit with the children.

Quintero testified to her belief it is in the children's best interest for Mother's and Father's parental rights to be terminated. Also, Quintero testified Mother and Father have created an unsafe and unstable environment for the children and neither Mother nor Father have a home for the children.

The children were moved into foster case in July 2018. In December 2019, when Quintero left the case, the children were in a foster home, were doing well, and had shown improvement. They were in the same home at the time of trial. Some behavioral issues persisted, but the children showed great improvement from what the family members had reported to Quintero. When the children first came into care, it was reported to Quintero that they were digging in the trash, scraping poop on the walls, and having tantrums. The children had to be separated and could not be together in the same room. When Quintero left the case, the children were still having issues but "mostly" were doing well. Quintero had no concerns about the foster placement.

Charna, the foster father, testified "it was quite a zoo" at first. The children did not listen and exhibited a lot of anger towards each other and other people both in and out of the household. The children required a lot of redirection and it took too much time to get them to bed. When the children first came to the Charna's home, Ada was extremely angry at Ally and they could not be left together unsupervised. Ada initially did well at school but began to exhibit poor behavior. The Charnas were proactive, and a 504 plan was instituted. By the end of the school year, Ada was "back on track." At the time of trial, things were much better.

Ally is in the head-start program and is very smart, though she lies a lot and is very manipulative. The Charnas continue working hard on those issues, and Ally

has improved. The Charnas took Ally to a lazy eye specialist, who found that she had only 20/80 vision and was at risk for losing sight in that eye. After three months wearing glasses coupled with therapy, however, Ally's vision has so far corrected to 20/60 in that eye, and surgery is currently believed to be no longer necessary.

Eddy was not really talking when he came to the Charnas and was behind in his language skills. Eddy did not know how to react to people and situations; he would go into a corner and cry. When Eddy spoke, he could barely be understood. Eddy's language skills have improved because he sees a speech pathologist weekly. He can now verbalize what he wants.

Charna testified there is still quite a bit of work to do for all three children, but they are headed in the right direction. The Charnas want to adopt all of the children.

## Analysis

### A.    Standards of Review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *In re A.C.*, 560 S.W.3d 624, 629 (Tex. 2018); *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

Due to the severity and permanency of terminating the parental relationship, Texas requires clear and convincing evidence to support such an order. *See* Tex. Fam. Code § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265-66 (Tex. 2002). "Clear and

convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a "correspondingly searching standard of appellate review." *In re A.C.*, 560 S.W.3d at 630; *see In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

Father challenges the legal and factual sufficiency of the evidence to support the trial court's findings. In reviewing legal sufficiency of the evidence in a parental termination case, we must consider all evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *Id.*; *In re G.M.G.*, 444 S.W.3d 46, 52 (Tex. App.—Houston [14th Dist.] 2014, no pet.). However, this does not mean that we must disregard all evidence that does not support the finding. *In re D.R.A.*, 374 S.W.3d at 531. Because of the heightened standard, we also must be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.*

In reviewing the factual sufficiency of the evidence under the clear-and-convincing standard, we consider and weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *In re A.C.*, 560 S.W.3d at 631; *see In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.O.A.*, 283 S.W.3d at

345. We give due deference to the fact finder's findings and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

## B. Predicate Grounds

In a proceeding to terminate the parent-child relationship under Texas Family Code section 161.001, the petitioner must establish by clear and convincing evidence one or more acts or omissions enumerated under subsection (1) of section 161.001(b) and that termination is in the best interest of the child under subsection (2). Tex. Fam. Code § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

In his first issue, Father argues the evidence was legally and factually insufficient to support termination under all predicate grounds found by the trial court: sections 161.001(b)(1)(D), (E), (P), (Q), and (O). If a trial court finds multiple predicate violations, we will affirm on any one violation that is established by clear and convincing evidence. *See In re T.N.F.*, 205 S.W.3d 625, 629 (Tex. App.—Waco 2006, pet. denied). Further, due to the significant collateral consequences of terminating parental rights under section 161.001(b)(1)(D) or (E),[2] "[a]llowing section 161.001(b)(1)(D) or (E) findings to go unreviewed on appeal when the parent has presented the issue to the court thus violates the parent's due process and due course of law rights." *In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019). Thus, when as here a parent challenges predicate termination grounds under either subsection 161.001(b)(1)(D) or (E), or both of those subsections, we must address and detail

---

[2] Section 161.001(b)(1)(M) provides that parental rights may be terminated if clear and convincing evidence supports that the parent "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law of another state." *Id.* § 161.001(b)(1)(M). Thus, when parental rights have been terminated for endangerment under either section 161.001(b)(1)(D) or (E), that ground becomes a basis to terminate that parent's rights to other children.

our analysis under one of those subsections. *See id*. We will address the trial court's finding of endangerment under subsection E.

Termination of parental rights is warranted if the fact finder finds by clear and convincing evidence, in addition to the best-interest finding, that the parent has, "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(E). "To endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). A finding of endangerment under subsection E requires evidence that the endangerment was the result of the parent's conduct, including acts, omissions, or failures to act. *In re S.R.*, 452 S.W.3d 351, 361 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Termination under subsection E must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id*. A court properly may consider actions and inactions occurring both before and after a child's birth to establish a course of conduct. *In re A.L.H.*, 515 S.W.3d 60, 91 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffer injury; rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re R.W.*, 129 S.W.3d 732, 738-39 (Tex. App.—Fort Worth 2004, pet. denied). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re F.E.N.*, 542 S.W.3d 752, 764 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *In re A.L.H.*, 515 S.W.3d at 92. Among the types of actions or omissions constituting evidence

meeting this standard are criminal activity, convictions, and incarceration. *See In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Evidence of criminal conduct, convictions, imprisonment, and their effects on a parent's life and ability to parent, may establish an endangering course of conduct. *In re S.M.*, 389 S.W.3d 483, 492 (Tex. App.—El Paso 2012, no pet.). Routinely subjecting children to the probability that they will be left alone because their parent is in jail endangers children's physical and emotional well-being. *See Walker v. Tex. Dep't of Family and Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Imprisonment alone is not an endangering course of conduct but is a fact properly considered on the endangerment issue. *Boyd*, 727 S.W.2d at 533-34.

Also, criminal drug abuse and knowledge that the child's other parent abused drugs is an action or omission that is evidence of endangering conduct. "Drug abuse and its effect on the ability to parent can present an endangering course of conduct." *In re J.J.W.*, No. 14-18-00985-CV, 2019 WL 1827591 *6 (Tex. App.—Houston [14th Dist. April 25, 2019, pet. denied) (mem.op.).

Domestic violence and a propensity for violence are likewise evidence of endangerment. "Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment." *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *accord S.R.*, 452 S.W.3d at 361. Violence does not have to be directed toward the child or result in a final conviction—"Texas courts routinely consider evidence of parent-on-parent physical abuse in termination cases without specifically requiring evidence that the conduct resulted in a criminal conviction." *In re V.V.*, 349 S.W.3d at 556. As this court has noted, parents' criminal conduct that exposes them to the possibility of incarceration

can negatively impact a child's living environment and emotional well-being. *In re S.M.L*, 171 SW3d 472, 479 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

The clear and convincing evidence of Father's repeated criminal conduct, convictions, imprisonment, and their collective effect on his ability to parent his children establishes an endangering course of conduct. Father has routinely subjected the children to a probability of being left alone because he is in jail, endangering their physical and emotional well-being. Between the date the Department intervened in this case and the date of judgment—a period of 21 months—Father was incarcerated for approximately 17 of those months. Father's acts of domestic violence and his propensity to engage in physical violence against family members is further evidence of endangerment. Father's criminal drug abuse and knowledge that Mother abused drugs is also evidence of endangering conduct.

Father did not participate substantially in the family service plan despite his knowledge that failing to do so risked termination of his parental rights. In terminating Father's parental rights, the trial court reasonably credited Father's inability or unwillingness to safeguard the children's physical and emotional well-being. Father's lack of effort to ensure the well-being of his children—coupled with the evidence of criminal conduct, drug abuse, and domestic violence—is sufficient to support a termination finding based on endangerment. *See In re Z.N.M.*, No. 14-17-00650-CV, 2018 WL 358480 at *6 (Tex. App.—Houston [14th Dist.] Jan. 11, 2018, no pet.) (mem. op.).

Considered in the light most favorable to the trial court's finding, the evidence is legally sufficient to support the trial court's determination that termination of Father's parental rights was justified under Family Code section 161.001(b)(1)(E). Further, in view of the entire record, we conclude the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that

termination was warranted under section 161.001(b)(1)(E). Accordingly, we conclude the evidence is legally and factually sufficient to support the subsection E finding.

Having concluded the evidence is legally and factually sufficient to support the trial court's finding under subsection E, we need not review the sufficiency of the evidence to support the subsections D, P, Q or O findings. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). We overrule Father's first issue.

## C.     Best Interest of the Children

We turn to Father's legal and factual sufficiency challenges to the trial court's best-interest findings.

The best-interest inquiry is child-centered and focuses on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d at 631. The trier of fact may consider several factors to determine the child's best interest, including: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parents' acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *In re E.R.W.*, 528 S.W.3d 251, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *see also* Tex. Fam. Code § 263.307(b) (listing factors to consider in evaluating parents' willingness and ability to provide the child with a safe environment).

Courts apply a strong presumption that the best interest of the child is served by keeping the child with the child's natural parents, and it is the Department's burden to rebut that presumption. *In re D.R.A.*, 374 S.W.3d at 531. Prompt and permanent placement in a safe environment also is presumed to be in the child's best interest. Tex. Fam. Code § 263.307(a). A finding in support of "best interest" does not require proof of any unique set of factors, nor does it limit proof to any specific factors. *See Holley*, 544 S.W.2d at 371-72.

We review the *Holley* factors in light of the evidence at trial. Applying them, we observe that the neither party presented testimony regarding the children's desires. However, there exists no evidence any of the children had bonded with Father, and he remained absent from them for most of the past two years. *See In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (When children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well cared for by the foster family, and have spent minimal time with a parent).

Father failed to demonstrate the ability to provide the children with a stable environment and emotional support. Except for his testimony at trial, Father has not demonstrated any desire or ability to be with his children. Father did not claim to have attempted to contact the children, provide anything for their care or support, or sought information about their well-being. The trial court reasonably could have inferred that because of Father's criminal conduct, drug abuse, and acts of domestic violence, the present and future physical and emotional needs of, or danger to, the children weighed in favor of finding termination was in their best interest.

Father did not contact the Department or seek services that might assist him in improving his parenting skills, despite having already begun a family service plan during his previous incarceration. A court may consider whether a parent

15

demonstrated willingness to effect positive environmental and personal changes within a reasonable amount of time. *See* Tex. Fam. Code § 263.307(b)(11). From Father's failure to demonstrate such a willingness, thus the trial court reasonably could have inferred Father's parental abilities weighed in favor of finding termination was in the children's best interest.

Viewing the evidence in the light most favorable to the judgment for our legal-sufficiency analysis and all of the evidence equally for our factual-sufficiency analysis, we conclude that a reasonable fact finder could have formed a firm belief or conviction that termination of Father's parental rights was in the children's best interest. *See* Tex. Fam. Code § 161.001(b)(2). We overrule Father's fourth issue.

## Conclusion

The evidence is legally and factually sufficient to support the predicate termination finding under subsection E. And, based on the evidence presented, the trial court reasonably could have formed a firm belief or conviction that terminating Father's parental rights was in the children's best interest so that they could promptly achieve permanency through adoption. *See In re M.G.D.*, 108 S.W.3d 508, 513-14 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

We affirm the decree terminating Father's parental rights and naming the Department managing conservator.


/s/     Kevin Jewell
          Justice


Panel consists of Justices Wise, Jewell, and Poissant.

16